# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2025

Lyle W. Cayce
Clerk

No. 25-30088

IN RE GARY WESTCOTT, *Secretary, Louisiana Department of Public Safety and Corrections*; DARREL VANNOY, *Warden, Louisiana State Penitentiary, In His Official Capacity*,

*Petitioners.*

Petition for a Writ of Mandamus
to the United States District Court
for the Middle District of Louisiana
USDC No. 3:12-CV-796

PUBLISHED OPINION

Before HAYNES, HO, and OLDHAM, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

Thirteen years ago, a group of Louisiana death row inmates filed suit challenging the State's use of lethal injection as a method of execution. The district court dismissed the suit as moot three years ago, because Louisiana no longer had the drugs it needed to perform lethal injection.

That suit remains moot today. But on Friday, February 21, 2025—just a few weeks before Jessie Hoffman's March 18, 2025, execution date—the district court reopened the suit under Federal Rule of Civil Procedure 60(b)(6). It did so, not because Hoffman sought to challenge the obsolete lethal injection protocol, but because he now sought to challenge the nitrogen hypoxia protocol that the State adopted last year.

No. 25-30088

In response, Louisiana officials filed this emergency petition for a writ of mandamus, asking this court to vacate the district court's February 21 order as an improper and unauthorized use of Rule 60(b)(6) to re-open a demonstrably moot case. We granted a temporary administrative stay of the order the very next day.

Two days later, Hoffman filed a new suit to challenge the nitrogen hypoxia protocol. That suit was assigned to the same district judge that re-opened the thirteen-year-old lethal injection suit.

The next day, we issued an order holding the mandamus petition in abeyance for one week. In doing so, we specifically noted that, "[i]n light of the new complaint, we anticipate that the district court will vacate its February 21, 2025 order." The district court declined to do so.

We now grant the writ of mandamus and direct the district court to vacate its February 21, 2025 order.

## I.

In 2012, Hoffman challenged Louisiana's lethal injection protocol as cruel and unusual punishment. Over the ensuing decade of litigation, including the intervention of nine other death row inmates as co-plaintiffs, this suit focused exclusively on the State's lethal injection protocol.

This litigation ended in 2022 when the district court dismissed this suit as moot because Louisiana was no longer able to obtain the drugs necessary to carry out executions under the challenged protocol. *See Hoffman v. Jindal*, 2022 WL 969050, *12 (M.D. La. Mar. 30, 2022). The plaintiffs there moved for reconsideration. The court denied the motion. *Hoffman v. Jindal*, 2022 WL 16571312 (M.D. La. Nov. 1, 2022).

Moreover, the district court emphasized that, if Louisiana were to select "an alternative means of execution" "in the future," Hoffman would

have "an *entirely different execution protocol* over which to litigate." *Id*. at *2 (emphasis added).

In March 2024, Louisiana adopted nitrogen hypoxia as an alternative method of execution. *See* La. Rev. Stat. § 15:569 (effective July 1, 2024).

But instead of filing a new suit to challenge the new protocol, the plaintiffs filed a motion for relief from the judgment under Rule 60(b)(6) two months later.

The district court left that motion untouched from June 2024 to February 2025. On February 21—shortly after the State scheduled Hoffman's execution for March 18, 2025—the court granted the motion to reopen the suit.

Petitioners filed an emergency petition for a writ of mandamus, directing the district court to vacate its February 21 ruling. We granted a temporary administrative stay the following day.

Two days later, Hoffman filed a separate suit challenging the State's nitrogen hypoxia protocol. That suit was assigned to the same district judge that re-opened the lethal injection suit.

So we held the mandamus petition in abeyance, noting that "we anticipate that the district court will vacate its February 21, 2025 order." The district court did not do so, so we now turn to the petition.

The mandamus petition is not mooted by Hoffman's execution on March 18, 2025. The matter before us remains a live controversy between Petitioners here and the remaining plaintiffs in the re-opened suit.

## II.

The Supreme Court has set forth the three conditions that must be satisfied before a writ of mandamus may issue. *See Cheney v. U.S. Dist. Court*

*for D.C.*, 542 U.S. 367, 380 (2004) (citing *Kerr v. United States Dist. Court for Northern Dist. of Cal.*, 426 U.S. 394, 403 (1976)). "First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81 (cleaned up). "Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." *Id.* at 381 (cleaned up). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

Petitioners meet all of these requirements.

### A.

First, Petitioners have "no other adequate means to attain . . . relief." *Id.* at 380.

We have long recognized that the indignity of being forced to litigate in the wrong proceeding cannot be remedied through "the regular appeals process." *In re Volkswagen of Am.*, 545 F.3d 304, 311 (5th Cir. 2008) (en banc) (quoting *Cheney*, 542 U.S. at 381). As we've explained, the harm from litigating in the wrong proceeding "will already have been done by the time the case is tried and appealed, and the prejudice suffered cannot be put back in the bottle." *Id.* at 319.

Our decision in *Volkswagen* involved a defect in venue. But we see no reason why the result should be any different for a jurisdictional defect such as mootness. Indeed, *Volkswagen* itself makes clear that "mandamus is appropriate 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction.'" *Id.* at 310 n.5 (quoting *In re Estelle*, 516 F.2d 480, 483 (5th Cir. 1975). *See also Will v. United States*, 389 U.S. 90, 95 (1967) ("The peremptory writ of mandamus has traditionally been used in the federal

courts . . . to confine an inferior court to a lawful exercise of its prescribed jurisdiction") (quotations omitted).  And Respondents do not contend otherwise.

## B.

Second, Petitioners' right to the writ is "clear and indisputable." *Cheney*, 542 U.S. at 381 (citation omitted).  To be sure, it is not enough to show that the district court erred or abused its discretion.  *See, e.g.*, *In re A&D Interests, Incorp.*, 33 F.4th 254, 257 (5th Cir. 2022).  But a writ is appropriate where "there has been a usurpation of judicial power." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500 (5th Cir. 2019) (citation omitted).  *See also Will*, 389 U.S. at 95 ("exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy" of mandamus).

The district court usurped judicial power when it invoked Rule 60(b) to re-open a moot case.  As the Supreme Court has reminded us, it is "by very definition" an "ultra vires" act "[f]or a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101–02 (1998).

It's well established, of course, that "[a]t all stages of litigation, a plaintiff must maintain a personal interest in the dispute." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021).  "[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." *Id.*

And that's precisely the problem here.  The district court properly dismissed this suit as moot in 2022.  *See Hoffman*, 2022 WL 969050, *12. Moreover, the district court itself observed that, in the event that Louisiana was to authorize "an alternative means of execution" at some point "in the

future," that would be "an *entirely different execution protocol* over which to litigate." *Hoffman*, 2022 WL 16571312, *2 (emphasis added).

We see nothing in Rule 60(b) that permits a district court to re-open a suit that that court itself previously (and correctly) dismissed as moot. And Respondents cite no authority to the contrary.

At bottom, Respondents' theory of the case is that they must have an opportunity to challenge the State's new method of execution. But it should go without saying that the proper way to challenge an "entirely different" and new execution protocol is to bring a new suit challenging that protocol— not to revive an old, moot suit challenging an obsolete protocol.

## C.

Finally, mandamus is plainly "appropriate under the circumstances." *Cheney*, 542 U.S. at 381.

The Supreme Court has instructed that mandamus relief is appropriate in cases of "public importance and exceptional character." *Ex parte Peru*, 318 U.S. 578, 586 (1943). *See also United States v. Abbott*, 92 F.4th 570, 577–78 (5th Cir. 2024) (Ho, J., dissenting) (collecting cases).

Most relevant here, mandamus is available "to restrain a lower court when its actions would . . . result in the 'intrusion by the federal judiciary on a delicate area of federal-state relations.'" *Cheney*, 542 U.S. at 381 (citation omitted).

Of course, that's precisely this case. Indeed, it's hard to imagine an area of greater state interest than the administration of its criminal justice system. *See*, *e.g.*, *Kelly v. Robinson*, 479 U.S. 36, 49 (1986) ("the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful of the considerations that should influence a court considering equitable types of relief"); *see also Bucklew v.*

*Precythe*, 587 U.S. 119, 134 (2019) ("[T]he Constitution affords a measure of deference to a State's choice of execution procedures and does not authorize courts to serve as boards of inquiry charged with determining 'best practices' for executions.") (citation omitted).

### III.

The dissent reaches a different conclusion, but it errs at every step of its analysis.

First, the dissent claims that mandamus is improper because "there are other adequate means of relief"—namely, "[t]he typical appellate process." *Post*, at _ (Haynes, J., dissenting).

But all the dissent is able to come up with are two cases that purportedly show that "we frequently address mootness and the viability of a Rule 60(b) order on appeal from a final judgment." *Post*, at _ (Haynes, J., dissenting) (citing *Env't Conservation Org. v. City of Dall.*, 529 F.3d 519 (5th Cir. 2008), and *Yesh Music v. Lakewood Church*, 727 F.3d 356 (5th Cir. 2013)).

The question before us, however, is not whether "the typical appellate process" is *available*—it's whether the typical appellate process is *adequate* for purposes of mandamus analysis. Tellingly, the cases cited by the dissent do not analyze (or even mention) mandamus (or adequacy) at all—let alone mandamus (or adequacy) in extraordinary cases like this one.

Moreover, the dissent concedes that mandamus is available to protect litigants from being forced to litigate in the wrong proceeding—at least when it comes to defects in venue. *See post*, at _ (Haynes, J., dissenting) (discussing *In re Volkswagen*). That concession destroys the dissent's entire theory, considering that "the typical appellate process" is available for defects in venue. *See, e.g., Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004) (reviewing venue after final judgment). Moreover, the

concession is further fatal to the dissent for yet another reason: This case involves the same kind of manipulation that animated *Volkswagen*—a district judge misapplying the rules in order to take over a dispute that rightfully belongs in another court.

The dissent further errs when it claims that mandamus is available when a court lacks venue, but not when it lacks jurisdiction. *See post*, at _ (Haynes, J., dissenting). That simply ignores governing Supreme Court and circuit precedent authorizing the use of mandamus "to confine an inferior court to a lawful exercise of its prescribed jurisdiction." *See, e.g.*, *Will*, 389 U.S. at 95; *In re Volkswagen*, 545 F.3d at 310 n.5 (quoting *Estelle*, 516 F.2d at 483). In fact, the Supreme Court has specifically endorsed the use of mandamus to prevent a federal court from exceeding its jurisdiction in a manner that intrudes on a state criminal prosecution. *See, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 29 (1926) ("there should be a more liberal use of mandamus" when it comes to "state prosecutions").

Second, the dissent insists that Petitioners lack "a clear and indisputable right to the writ" because this case is not moot. *Post*, at _ (Haynes, J., dissenting). The dissent theorizes that the decade-old suit is not moot—so no new or amended complaint is needed—because the old suit already challenges every possible method of execution. *See id.* at _.

But even the district court does not believe that. The district court admitted that it granted Rule 60(b) relief "to enable *amending this lawsuit* to challenge the current protocol." *Hoffman v. Jindal*, 2025 WL 582492, *4 (M.D. La. Feb. 21, 2025) (emphasis added). And for good reason: The operative complaint challenges execution protocols that involve "the use of expired and/or illegally-obtained drugs"—an obvious reference to the drugs used in lethal injection, as opposed to the use of nitrogen gas. *See, e.g.*, *Bucklew*, 587 U.S. at 142 n.1 (discussing State's use of nitrogen gas "due to

the unavailability of lethal injection drugs"); *Glossip v. Gross*, 576 U.S. 863, 880–81 (2015) (contrasting lethal injection drugs from lethal gas).

That admission is fatal to the dissent, because it cites no authority that allows the use of Rule 60(b) to revive a previously (and properly) mooted suit in order to amend it. The dissent simply says that district courts "frequently allow amendment." *Post*, at __ n.3 (Haynes, J., dissenting). But that's not to so much an argument as it is an admission that the suit is moot absent amendment.

The dissent attempts to bolster its position by describing Rule 60(b)(6) as a "grand reservoir of equitable power to do justice." *Post*, at ___ (Haynes, J., dissenting) (quoting *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)).

But notwithstanding the grandiose metaphor of a "grand reservoir," the reality is that "we have also narrowly circumscribed its availability, holding that Rule 60(b)(6) relief 'will be granted *only* if *extraordinary circumstances* are present.'" *Batts*, 66 F.3d at 747 (quoting *Bailey v. Ryan Stevedoring Co.*, 894 F.2d 157, 160 (5th Cir. 1990) (emphasis added). *See also*, *e.g.*, *Yesh Music*, 727 F.3d at 363 (same).

This case falls short of the 60(b)(6) extraordinary circumstances standard, as a closer reading of our precedents make amply clear. Our precedents require a Rule 60(b)(6) movant to demonstrate how "the initial judgment" was "manifestly unjust." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 357 (5th Cir. 1993). We do not see how the "initial judgment" here could possibly be "manifestly unjust," considering that the judgment here was indisputably correct, based on the law and facts present at the time.

To the contrary, we've repeatedly observed—including in *Batts*— that "[c]hanges in decisional law based on constitutional principles are *not* of themselves extraordinary circumstances sufficient to justify Rule 60(b)(6)

relief." *Batts*, 66 F.3d at 749 (emphasis added). We do not grant relief based on subsequent developments in the law for one simple reason: our "even stronger interest in finality [of judgments]." *Priester v. JP Morgan Chase Bank, N.A.*, 927 F.3d 912, 913 (5th Cir. 2019). *See also id.* (emphasizing "the great desirability of preserving the principle of the finality of judgments") (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981)). After all, "[c]onsider the implications if a 'change in law' automatically allowed cases to be reopened. If that were the law, then anytime the Supreme Court resolved a circuit split courts that had taken the rejected position would have to restart long-resolved cases." *Id.* And the same logic should readily apply whether the change in law comes from the judiciary or the legislative branch.

The only case the dissent cites in response is *Buck v. Davis*, 580 U.S. 100 (2017). *See post*, at _ (Haynes, J., dissenting). But *Buck* did not grant 60(b)(6) relief based on a change in law after final judgment. It granted 60(b)(6) relief based on what the State did at trial—it focused on the "one thing [that] *would never change*: the color of Buck's skin." 580 U.S. at 121 (emphasis added). *Buck* holds that racial discrimination, not a change in law, constitutes an extraordinary circumstance under Rule 60(b)(6). After all, "[r]elying on race to impose a criminal sanction poisons public confidence in the judicial process." *Id.* at 124. "Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6)." *Id. See also id.* at 125 (noting "the express recognition by a Texas attorney general that the relevant testimony was inappropriately race charged" and that "these were . . . 'extraordinary' cases").

Finally, the dissent suggests that our faithful application of our mandamus precedents and Rule 60(b)(6) standards is somehow unfair because it will leave death row inmates with "little time" to litigate their claims. *Post*, at _ (Haynes, J., dissenting). But that's belied by the record—

No. 25-30088

Hoffman's new suit was not only heard by the district court, but also this court and the Supreme Court, all prior to his execution. *See Hoffman v. Westcott*, 2025 WL 763945 (W.D. La. Mar. 11, 2025), *rev'd, Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025), *stay denied*, _U.S. _ (2025).[1]

* * *

If a district judge manipulates the legal process in order to claim jurisdiction over an issue of great public interest that properly belongs in another court—and ultimately to the people and their elected representatives—it falls on the appellate courts to restore the constitutional balance. "When district courts overstep their bounds and exercise powers that properly belong in another branch of government, it is incumbent on federal appellate courts to right the ship and ensure that the judiciary does

---

[1] The dissent intimates that these multiple appeals were not enough, because they were processed too quickly. *Post*, at _ n.5 (Haynes, J., dissenting). So the dissent would have postponed the execution. *See also Hoffman*, 131 F.4th at 337 (Haynes, J., dissenting). But the Supreme Court declined to do so. _ U.S. at _. And for multiple good reasons. To begin with, the dissent's plea for delay ignores the fact that the claims are so plainly devoid of merit. *See Hoffman*, 131 F.4th at 333 ("[Hoffman's constitutional challenge] is not just wrong. It gets the Constitution backwards, because it's premised on the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution—namely, execution by firing squad rather than by nitrogen hypoxia. That can't be right. Indeed, it contravenes Supreme Court precedent."). The plea for delay also ignores the "important interest" of "[b]oth the State and the victims of crime . . . in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149. Excess delay prolongs the suffering of the victim's family, "frustrates the purpose of retribution," and makes a "mockery of our criminal justice system." *Coleman v. Balkcom*, 451 U.S. 949, 958, 960 (1981) (Rehnquist, J., dissenting). *See also, e.g., Ramirez v. Collier*, 595 U.S. 411, 456–57 (2022) (Thomas, J., dissenting) ("[B]y evading his sentence, Ramirez has inflicted recurrent emotional injuries on the victims of his crime. . . . These four siblings ask that their father 'finally have his justice' so that 'this nightmare can be over.'") (quoting amicus brief of victim's family); *Murphy v. Collier*, 139 S. Ct. 1475, 1481 (2019) (Alito, J., dissenting from grant of application for stay) (delay "inflict[s] further emotional trauma on the family of the murder victim").

No. 25-30088

not exceed its authority under Article III of the Constitution." *Hoffman*, 131 F.4th at 336.

We grant the writ of mandamus, and direct the district court to vacate its February 21, 2025, order and deny the Rule 60(b) motion.

No. 25-30088

Jᴀᴍᴇꜱ C. Hᴏ, *Circuit Judge*, concurring:

This is not the first time our court has had to step in because a district court abused its powers. When a district court exceeds its limited role under our Constitution and violates our Founders' commitment to self-government and popular sovereignty, it threatens the credibility of the federal judiciary—and demands the active and aggressive intervention of the appellate courts.[1]

## I.

It's often said that the judiciary is a "co-equal" branch of government.[2] But that's wrong.[3]

The judiciary has an important role in our constitutional republic. But it's a limited one. Judges don't write the law. Nor do judges execute the law.

---

[1] *See, e.g.*, *Pierre v. Vannoy*, 891 F.3d 224, 229 (5th Cir. 2018) ("The district court's failure to even mention [governing precedent] is particularly troubling."); *id.* at 230, 232 (Ho, J., concurring) ("[T]he district court failed to demonstrate the respect for States . . . [W]e do not countenance people taking the law into their own hands. This principle binds federal judges as well."); *Whole Woman's Health v. Smith*, 896 F.3d 362, 373–76 (5th Cir. 2018) (reversing "disturbing" and "ill-informed" district court order that "looks like an act of intimidation" issued "in unnecessary haste"); *id.* at 376 (Ho, J., concurring) ("[T]he proceedings below . . . are troubling. They leave this Court to wonder [if the district court was engaged] in an effort to . . . evade appellate review."); *Wittmer v. Phillips 66*, 915 F.3d 328, 330 (5th Cir. 2019) ("[T]he district court did not mention, let alone distinguish, [governing precedent]."); *id.* at 341 (Ho, J., concurring) ("our courts are giving the people reason" to "los[e] faith in their institutions"). *See also M.D. v. Abbott*, 977 F.3d 479, 481, 483 (5th Cir. 2020) ("District courts do not have discretion to ignore mandates issued by this court. . . . [That] would replace judicial hierarchy with judicial anarchy."); *United States v. Abbott*, 92 F.4th 570, 576 (5th Cir. 2024) (Ho, J., dissenting) (noting district court's "obvious and transparent attempt to thwart our en banc proceedings").

[2] *See, e.g.*, *United States v. Cowan*, 524 F.2d 504, 507 (5th Cir. 1975); *Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019).

[3] *See, e.g.*, Tʜᴇ Fᴇᴅᴇʀᴀʟɪꜱᴛ No. 48, at 334 (James Madison) (J. Cooke ed. 1961) (noting the "superiority" of the legislative branch as compared to the judiciary); *Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273 (1991) (same).

No. 25-30088

As Americans, we believe that we should be governed by the people—not by judges with life tenure. Our Founders didn't fight a Revolutionary War to replace one king in royal garb with hundreds of kings in judicial robes.

Judges are only supposed to interpret and apply the law to whatever disputes are brought before us. So we're not an active branch—we're a passive branch. And under the Constitution of our Founders, the judiciary is the least powerful branch. We have the power to issue judgments—but we lack the power to enforce them. We hold neither the sword nor the purse. All we have is our voice.

So we must earn the respect of the other branches. We must demonstrate that our rulings are based on what the law is—not our personal views on what the law should be.[4]

The American people don't believe in judicial independence so that judges can be imperial—the people believe in judicial independence so that judges will be impartial. If we lose their trust, that will be fatal to the rule of law. And it will be entirely our fault.[5]

---

[4] *See, e.g.*, THE FEDERALIST No. 78, at 523 (Alexander Hamilton) ("[T]he judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. . . . The judiciary . . . has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."); *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 818 (1987) (Scalia, J., concurring in the judgment) (same).

[5] *See, e.g.*, G. Barry Anderson, *Preserving the Independence of the Judiciary*, LITIGATION 3 (Winter 2009) ("When told about the importance of judicial independence, the public's first reaction is to ask, 'Independent from what?' The fear is that 'independent' translates into 'unaccountable' and perhaps even 'arrogant.' I have found that focusing on judicial 'impartiality' is far more effective, and perhaps more accurate.").

No. 25-30088

## II.

Every level of the judiciary risks losing its credibility if judges fail to live up to these principles. But appellate courts have at least one built-in check: No appellate judge can act alone. Appellate courts act only through multi-member panels. So appellate judges must convince their colleagues before they can exercise the judicial power of the United States.

District court decisions, by contrast, are (with rare exception) made by just one judge. District judges are the only members of the judiciary who can exercise the judicial power of the United States without anyone's consent but their own.[6]

With unilateral power, there's unique danger that some district courts may get off track. So it's vital that district judges exercise their powers carefully and with integrity—and critical that appellate judges be ready to intervene when district courts refuse to stay in their lane.

Appellate courts even have the power to remove a district judge from a case altogether. *See, e.g.*, *M.D. by Stukenberg v. Abbott*, 119 F.4th 373, 386–95 (5th Cir. 2024); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 497 & n.28 (5th Cir. 2022).

---

[6] Indeed, it's precisely because of concern with the unilateral authority of district judges that there are proposals to limit certain district court actions, such as universal injunctions, to three-judge panels. As a respected former member of this court has observed, when litigants "need find only a single district judge who agrees with them," "[t]hat lone judge issuing a nationwide injunction effectively overrules numerous judges who may have already rejected the same claim." Gregg Costa, *An Old Solution to the Nationwide Injunction Problem*, Harv. L. Rev. Blog (Jan. 25, 2018). "It also subverts our judicial hierarchy as a nationwide injunction issued by a single district judge has greater effect than a court of appeals' decision on the same issue in a noninjunction posture (that decision would only be binding within the circuit)." *Id.*

In particular, an appellate court can remove a district judge who appears to be manipulating the process to ensure the assignment of certain cases that that judge favors. In *Ligon v. City of New York*, 736 F.3d 118 (2nd Cir. 2013), the Second Circuit *sua sponte* removed a district judge from several cases because she coached litigants to bring suits that she could "accept . . . as a related case" under the district's related case rule. *Id.* at 125. *See generally id.* at 124–29.

If appellate courts can remove a district judge for manipulating the process to secure certain case assignments, then we should likewise have the power to mandamus a district judge to prevent such docket manipulation in the first place. *See ante*, at 2, 8, 11.

## III.

Our dissenting colleague asks: What's the rush? Even assuming that the district court erred, the dissent contends that there's no need for immediate relief—just let things play out through "[t]he typical appellate process." *Post*, at __ (Haynes, J., dissenting).

But that's cold comfort to the millions of voters who took the time to participate in the democratic process, only to see their legitimate efforts unlawfully undone by a single district judge.

If a district judge abuses the legal process in a hurried effort to thwart the lawful political choices of the electorate, appellate courts are well within their right to intervene and grant emergency relief.

The Supreme Court did just that last week in *Trump v. J.G.G.*, __ U.S. __ (2025). There (as here), a district court presumed to seize control over a case of profound public interest that it had no lawful business deciding, because it belonged in another court. So the Supreme Court intervened and took the case away from the district court. *See id.* at __ ("Challenges to

No. 25-30088

removal under the [Alien Enemies Act] . . . must be brought in habeas. . . . [J]urisdiction [in habeas cases] lies in only one district: the district of confinement.  The detainees are confined in Texas, so venue is improper in the District of Columbia.") (cleaned up).

Like our dissenting colleague here, the dissenting Justices in *J.G.G.* urged delay.  The dissent agreed with the majority that the only thing at stake was deciding which district court had the authority to decide the case.  *See id.* at _ (Sotomayor, J., dissenting) (noting that the dispute merely concerned "which procedural vehicle is best situated for the Plaintiffs' injunctive and declaratory claims").  But the dissent maintained that there was no need for appellate courts to "rush" in and "decide the issue now"—just wait for an appeal in the "ordinary course."  *Id.* at _ (Sotomayor, J., dissenting).

The Supreme Court rejected the dissent's plea for delay.  The majority understood that waiting for an appeal in the "ordinary course" would inadequately protect the government from the indignity of litigating in the wrong proceeding—not to mention unduly delay the expressed will of the people.  As the Court put it, "[w]e see no benefit in such wasteful delay."  *Id.* at _.

I most certainly concur.  When a district judge acts hastily, yet appellate courts are told not to "rush in," that's not a plea for judicial sobriety—it's a recipe for district judge supremacy.

No. 25-30088

Haynes, *Circuit Judge*, dissenting:

I respectfully dissent from granting mandamus. As the order explains, we may issue a writ of mandamus only if (1) there are no other adequate means of relief, (2) the petitioner has demonstrated a clear and indisputable right to the writ, and (3) our exercise of discretion to issue the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). None of these conditions are satisfied.

## I.    Other adequate means of relief

First, there are other adequate means of relief. The typical appellate process provides an adequate remedy. "Mandamus, it must be remembered, does not run the gauntlet of reversible errors." *Will v. United States*, 389 U.S. 90, 104 (1967) (internal quotation marks and citation omitted). Indeed, we frequently address mootness and the viability of a Rule 60(b) order on appeal from a final judgment. *See e.g.*, *Env't Conservation Org. v. City of Dall.*, 529 F.3d 519 (5th Cir. 2008); *Yesh Music v. Lakewood Church*, 727 F.3d 356 (5th Cir. 2013).[1]

The mandamus order states, "As we've explained, the harm from litigating in the wrong proceeding 'will already have been done by the time the case is tried and appealed, and the prejudice suffered cannot be put back in the bottle.'" (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 319 (5th Cir. 2008) (en banc)). However, *In re Volkswagen* is not about "litigating in the wrong proceeding" generally, *id.*; it is about venue that was clearly and indisputably improper—it certainly did not hold that all venue issues are

---

[1] The mandamus order fails to cite a case concluding that (1) mandamus is available for mootness or Rule 60(b)(6) motions, (2) a district court abuses its discretion in reopening a case that is not moot, much less a case holding that such an abuse is "clear and indisputable," or (3) legislative changes are decisional law that cannot provide the basis to reopen a case under Rule 60(b)(6).

subject to mandamus.  There are at least two reasons to treat a motion to change venue differently from a Rule 60(b) motion.

First, post-judgment reversal for improper venue requires that the party show it would have won in the desired forum.  *See In re Rolls Royce Corp.*, 775 F.3d 671, 676 (5th Cir. 2014).  This requirement makes it exceedingly challenging to win the issue on appeal of a final judgment.  17 James Wm. Moore et al., Moore's Federal Practice § 111.63 (3d ed. 2025) (explaining that it is difficult to succeed in an appeal of transfer motions in part because of this requirement).  Accordingly, as we have held, this requirement renders post-judgment review inadequate.  *In re Rolls Royce Corp.*, 775 F.3d at 676; *In re Volkswagen*, 545 F.3d at 319.  Reversing a Rule 60(b) order, meanwhile, does not require a similar showing of prejudice.  Unlike our review of venue, for Rule 60(b) orders we apply the same standard post-judgment as the mandamus order applies here.  *See Edwards v. 4JLJ, L.L.C.*, No. 23-40189, 2024 WL 983657, at *2 (5th Cir. Mar. 7, 2024) (per curiam) (applying the same standard as the mandamus order for reversing a Rule 60(b)(6) motion on appeal from final judgment).

Second, *In re Volkswagen*'s analysis relied on the harm from litigating in an improper venue—"inconvenience to witnesses, parties and other[s]."  *In re Volkswagen*, 545 F.3d at 319.  However, that harm is certainly not present here.  No one disputes that venue is proper here.  Parties will have to litigate these claims in Louisiana regardless, even if Plaintiffs refile, which would lead to appeals if necessary.

Rather than discussing whether the rationale for granting mandamus in venue cases applies in this context, the mandamus order simply states that it sees "no reason why the result should be any different."  However, mandamus is an extraordinary remedy for good reason, and I would not dispense of its requirements so quickly.  *See Kerr v. U.S. Dist. Ct. for N. Dist.*

*of Cal.*, 426 U.S. 394, 403 (1976) ("A judicial readiness to issue the writ of mandamus in anything less than an extraordinary situation would run the real risk of defeating the very policies sought to be furthered by th[e] judgment of Congress [in creating the final-judgment rule].").   In sum, the idea that Petitioners have "no other adequate means to attain the relief" is simply not accurate.  *Cheney*, 542 U.S. at 380 (quotation omitted).[2]

## II.     Clear and indisputable right to the writ

Turning to the next requirement, Petitioners have not demonstrated a clear and indisputable right to the writ.  To start, the mandamus order incorrectly concludes that this case is still moot.  Indeed, this case presents a live controversy.   The latest operative complaint contests Louisiana's execution protocols generally, "whether performed pursuant to the latest protocol . . . *or performed pursuant to a newly amended protocol with insufficient time for review and evaluation*" (emphasis added).[3]   As the district court explained, "[t]his case has always been about Louisiana's execution protocol. It is still about Louisiana's execution protocol.  And now that the protocol appears viable, there is an actionable case and controversy."  *Hoffman v. Jindal*, 3:12-cv-796-SDD-EWD, 2025 WL 582492, at *4 (M.D. La. Feb. 21,

---

[2] The mandamus order characterizes my position as saying that mandamus is available when a court lacks venue but not when it lacks jurisdiction.  Its characterization is wrong.  Mandamus is only available when the petitioner shows no other adequate means of relief, a clear and indisputable right to the writ, and the appropriateness of the writ under the circumstances.  Petitioner has not done so here.

[3] According to the mandamus order, fatal to my dissent is the district court's statement that it granted Rule 60(b)(6) relief to allow amendment of the lawsuit to challenge the new protocol.  However, the complaint makes clear that Plaintiffs anticipated that Louisiana would change the protocol, issue a death warrant, and execute a person in quick succession, and Plaintiffs wanted their day in court for newly amended protocols. District courts frequently allow amendment, so it is not correct that the district court's invitation to amend impacts the challenges brought in the latest operative complaint.

No. 25-30088

2025).  The mandamus order offers no explanation for why Plaintiffs must separately file their challenge to the nitrogen hypoxia protocol when the complaint in this matter addresses *more* than just the lethal injection protocol. Rather, the mandamus order simply rests on a principle that "go[es] without saying"—citing no legal support and failing to refute the district court's analysis.  Although Hoffman has been executed, several death row inmates remain Plaintiffs in the case.  Those Plaintiffs continue to challenge the constitutionality of their execution, so the case is not moot.[4]

Moreover, Petitioners have not clearly and indisputably demonstrated that reopening a previously moot case under Rule 60(b)(6) is inappropriate once the case becomes ripe.  When the district court previously dismissed the Plaintiffs' case without prejudice, the only potential execution method— lethal injection—was no longer being used.  *Hoffman v. Jindal*, 3:12-cv-796-SDD-EWD, 2022 WL 969050, at *12 (M.D. La. Mar. 30, 2022).  On reconsideration of its dismissal order, the district court stated that if Louisiana authorizes another execution protocol, Plaintiffs could litigate the new protocol.  *See Hoffman v. Jindal*, 3:12-cv-796-SDD-EWD, 2022 WL 16571312, at *2 (M.D. La. Nov. 1, 2022).  The district court never said a new case (which would require additional time and work) had to be filed.  *See id.* Having  dismissed  without  prejudice  and  having  now  granted  the

_____

[4] The mandamus order implies that the district court should have vacated its order reopening the case in light of a new suit that Hoffman filed.  But the mandamus order leaves out important background.  We held the mandamus in abeyance in light of the new suit Hoffman filed.  We eventually denied the mandamus as moot in light of Hoffman's new suit.  Then Louisiana moved for reconsideration, given that Hoffman was not the only plaintiff in this case.  We granted the motion for reconsideration because Louisiana was correct—Hoffman's new suit did not moot this case given that plaintiffs include several other death row inmates aside from Hoffman.  Accordingly, our discussion of vacating the order was only regarding Hoffman's new suit.  That new suit did not moot this one nor require vacation of the order given that it involves the other parties.

Rule 60(b)(6) motion, the district court clearly intended to consider the case once it became ripe.

I further disagree with the mandamus order's narrow reading of Rule 60(b)(6). The mandamus order concludes that nothing in Rule 60(b) permits the district court to reopen this suit. However, district courts have discretion in granting Rule 60(b)(6) motions, *Diaz v. Stephens*, 731 F.3d 370, 374 (5th Cir. 2013), and Rule 60(b)(6) is "a grand reservoir of equitable power to do justice in a particular case," *Batts v. Tow–Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) (quotation omitted). Granting a Rule 60(b)(6) motion in the context of "extraordinary circumstances" is not as narrow an inquiry as the mandamus order asserts: "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors," including "the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (internal quotation marks and citation omitted).

Here, the district court faced the difficult task of litigating the merits of multiple death penalty challenges quickly and efficiently. As the complaint alleges, Louisiana has "engaged in a pattern of revising the execution protocol immediately before a scheduled execution date" and has "refus[ed] to provide access to the protocols." These allegations proved true in Hoffman's execution. Louisiana issued death warrants to two named Plaintiffs in mid-February, with the executions to occur one month later. Although Louisiana promulgated the nitrogen hypoxia execution protocol in early February, Louisiana did not provide the protocol to Plaintiffs until early March, leaving little time for Plaintiffs with March execution dates to challenge the constitutionality of their executions. The district court granted the motion for reconsideration in February, soon after Louisiana issued the death warrants and only a few weeks before the scheduled execution date.

No. 25-30088

The circumstances do not get much more extraordinary than a district court ensuring that inmates with fast-approaching execution dates have access to the courts for their constitutional challenge to their executions. *See Buck*, 580 U.S. at 128 (reversing the Fifth Circuit's denial of certificate of appealability because plaintiff demonstrated entitlement to relief under Rule 60(b)(6) in his challenge asserting that he was sentenced to death based on race). The district court, acknowledging the importance of "judicial efficiency and economy" in a case involving the "protection of constitutional rights in relation to human life," granted the Rule 60(b)(6) motion. *Hoffman*, 2025 WL 582492, at *4. I cannot conclude that the district court clearly and indisputably abused its discretion in granting a Rule 60(b)(6) motion after concluding that the suit is no longer moot. Indeed, Rule 60(b)(6) has been used to reopen disputes dismissed for lack of jurisdiction, so long as there is some basis for jurisdiction upon reopening suit. *See Le Blanc v. Cleveland*, 248 F.3d 95, 98–101 (2d Cir. 2001) (per curiam) (concluding that the district court erred by denying Rule 60(b)(6) motion to allow plaintiff to amend complaint to plead diversity jurisdiction after dismissing for lack of admiralty jurisdiction); *Fairfax Countywide Citizens Ass'n v. County of Fairfax*, 571 F.2d 1299, 1303 (4th Cir. 1978) (holding that a district court has authority under Rule 60(b)(6) to vacate its dismissal and reinstate lawsuit after repudiation of a settlement agreement, so long as there is a basis for federal jurisdiction). Instead of engaging with the district court's analysis, and without citing legal support, the mandamus order simply concludes that nothing supports using Rule 60(b) to reopen this case.[5]

---

[5] The mandamus order suggests that Hoffman had enough time to litigate his death penalty challenge because it reached the Supreme Court. By focusing on the number of courts that heard his challenge, the mandamus order glosses over the expedited timeline—due to Louisiana's own delay—under which the courts had to consider Hoffman's challenge. The district court issued its preliminary injunction on March 11, 2025, after only

No. 25-30088

The mandamus order cites *Batts* for the proposition that changes in decisional law "are not of themselves extraordinary circumstances sufficient to justify Rule 60(b)(6) relief." *See* 66 F.3d at 749. In *Batts*, after trial, final judgment, and appeal, the Mississippi Supreme Court clarified that it had moved away from the test that governed the claims in *Batts*, and toward a different test. 66 F.3d at 746. The district court granted Rule 60(b)(6) relief because of the change in decisional law, and we reversed because a change in decisional law alone does not warrant relief from judgment. *Id.* at 746–47. That is not at all the situation here because the original judgment was *without* prejudice. It also was *not* a final judgment on the merits. Further, statutory law (the nitrogen hypoxia statute), not decisional law, is at play here. *Decisional Law*, BLACK'S LAW DICTIONARY 270 (7th ed. 1999) (caselaw excludes statutes); *see also Caselaw*, BLACK'S LAW DICTIONARY (12th ed. 2024) (caselaw is "[a]lso termed *decisional law*."). A very different context.[6]

Beyond the mandamus order's narrow reading of Rule 60(b)(6), it fails to account for the exceptionally high standard that courts of appeals should use when evaluating if a writ is appropriate. The order states that Petitioners have a clear and indisputable right to the writ because it may be

---

two weeks of expedited discovery. We ruled on March 14, 2025, and the Supreme Court ruled on March 18, 2025—exactly one week after the district court entered its preliminary injunction. So no, my statement that Hoffman had little time to challenge his execution method is not "belied by the record."

[6] The mandamus order's reliance on the decisional law principle is further problematic because a change in law combined with something else (such as a change in fact) is sufficient to warrant Rule 60(b)(6) relief. *See Buck*, 580 U.S. at 126, 128 (holding that petitioner was "entitle[d] to relief under Rule 60(b)(6)" because of a change in law and developments of fact); *Gonzalez v. Crosby*, 545 U. S. 524, 531 (2005) ("[A] motion might contend that a subsequent change in substantive law is a 'reason justifying relief,' FED. RULE CIV. PROC. 60(b)(6), from the previous denial of a claim.").

used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction." (quoting *Will*, 389 U.S. at 95). But *Will* made clear that "only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy." *Will*, 389 U.S. at 95. *Will* also offered examples of situations that meet that extremely high bar: judicial action that threatens to embarrass the executive branch in conducting foreign relations, judicial intrusion on a delicate area of federal-state relations, judicial action that is contrary to an appellate court's mandate, and *persistent* disregard for the Federal Rules of Civil Procedure by a district judge. *Id.* at 95–96. These are the types of "usurpations of judicial power" that the writ is properly reserved for, not close calls over whether a district court properly exercised its discretion in granting a Rule 60(b)(6) motion. *See In re Estelle*, 516 F.2d 480, 483 (5th Cir. 1975) ("[Mandamus is] not to be used . . . to control the decision of the trial court in discretionary matters." (internal quotation marks and citation omitted)). The mandamus order concludes that this case implicates the "delicate area of federal-state relations," but this case does not come close to cases that have previously been held to implicate that balance. *See, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 34–35 (1926) (granting mandamus to compel a federal district judge to remand to state court an indictment for murder). This is especially so because no one disputes whether a federal court can hear the Plaintiffs' case; the only dispute is whether the challenge must be filed separately from the present case.

In sum, Louisiana has not met the tall task of demonstrating a clear and indisputable right to the writ.

## III.    Appropriateness of the writ

Given the situation here, I would not exercise our discretion even if we reached the third prong. Mandamus is a drastic remedy, "to be invoked

only in extraordinary situations." *Kerr*, 426 U.S. at 402. Mandamus "is not to be used as a substitute for an appeal, or to control the decision of the trial court in discretionary matters." *Plekowski v. Ralston-Purina Co.*, 557 F.2d 1218, 1220 (5th Cir. 1977). District courts can make all kinds of decisions early in the life of a lawsuit that require reversal after a jury verdict. If that were enough to grant mandamus, that would lead to a huge number of mandamus cases in our court. But the writ of mandamus is, understandably, highly limited to only very few situations. This is simply not one of the few cases that warrant such extraordinary relief.

\*     \*     \*

Finally, the mandamus order accuses the district judge of "manipulat[ing] the legal process in order to claim jurisdiction over an issue of great public interest that properly belongs in another court." It levels this serious allegation without offering any support and despite neither party questioning the district judge's integrity. I would not cast aspersions on the intentions of the district judge in this case.

Because Petitioners have not met their burden on any element, I respectfully dissent from the grant of mandamus.